HALL, Judge.
On February 3, 1961, the plaintiff, Chas. A. Kaufman Co., Limited, owner and operator of a department store in New Orleans, filed suit seeking to recover from the defendant, Julian O. Gregory, the sum of $75,000.00 representing the amount of funds which it alleged defendant had wrongfully appropriated to himself out of the cash receipts of plaintiff’s Dryades Street store during the period from June 1, 1959 through January 21, 1961 while defendant was employed as its comptroller. In connection with its suit plaintiff sought and obtained a resident writ of attachment accompanied by garnishments by virtue of which defendant’s bank accounts were seized. Defendant filed a motion to dissolve the attachment, which motion was maintained by the Trial Court. Plaintiff appealed and this Court affirmed the ruling of the Trial Court (see 145 So.2d 119) but writs were granted by the Supreme Court, and on June 4, 1963 the Supreme Court reversed and remanded the cause to the Trial Court with instructions. (See 244 La. 766, 154 So.2d 392.)
While the motion to dissolve was pending on appeal defendant filed an answer and a reconventional demand for damages. Defendant’s reconventional demand was dismissed by the Trial Court on exceptions of no cause nor right of action and the case went to trial on the merits. The trial was very lengthy, having consumed eleven separate trial days starting in June and ending in October 1962.
Following the Supreme Court’s remand of the motion to dissolve the attachment, the parties entered into a written stipulation by which it was agreed that all testimony and exhibits received and admitted in evidence during the trial on the merits be considered by the Court as having also been received and admitted in evidence during the hearing of the motion to dissolve.
On June 25, 1964 the Trial Court rendered judgment for defendant dismissing plaintiff’s suit and recalling and vacating the writ of attachment previously issued. Plaintiff appealed. Defendant answered the appeal praying that the judgment appealed from be affirmed and that the case be remanded in order to permit him to proceed with proof on his reconventional demand for damages for unlawful issuance of the writ of attachment.
Defendant had been employed as plaintiff’s comptroller since October 1954. On January 21, 1961 defendant voluntarily left plaintiff’s employ, plaintiff paying his salary up to March 1. During the week following defendant’s departure Mrs. Giusti (plaintiff’s Sales Audit Supervisor) noticed that the Monthly . Commission Summary for December 1960 showed a greater volume of sales than those which had been recorded and reported by defendant. Further comparisons showed that the cash sales reflected by the cash commission tickets exceeded the cash sales reported by defendant in his Daily Summary of Cash Sales for December.
At this time Mrs. Giusti searched for the basic cash sales records for December, primarily the cash register tapes, the Sales Audit Report, and the Daily Cashier’s Summary and could find those records for only four days in December. Further search revealed that such basic cash media could be found for only twelve scattered days during the entire period from June 1, 1959 to January 17, 1961.
Plaintiff filed this suit on February 3, 1961 charging defendant with embezzlement. In early March plaintiff consulted Mr. James W. Thokey, a certified public accountant, informed him that it was believed a cash shortage existed, and employed him to determine from such records as were available whether a cash shortage had occurred at the Dryades Street store, *302 and if so, in what amount. Mr. Thokey commenced his investigation on March 16, 1961. He first questioned plaintiff’s office employees and ascertained from them that funds from cash sales and records of those sales were handled and prepared as follows:
a) Upon making a cash sale the sales clerk “rang up” the sale on her cash register, which printed on a paper tape the total amount of cash taken in, the date and the clerk’s number. At the end of the day the clerk removed the money from the register, placed it in a bag, and delivered -it to the cashier 'with a “tally”.
b) The bags were locked in a safe overnight by the cashier. The following morning the cashier opened the bags and after checking the amount of funds against the clerks’ tallies, prepared a Daily Cashier’s Summary showing the total amount of cash turned in by the clerks the preceding day. She would then compare her summary with the summary prepared by the Sales Audit Department.
c) On the morning after the selling day the cash register tapes were removed from the cash registers and delivered to the Sales Audit Department. From these tapes a clerk would prepare daily a Summary of Cash Sales by Department and by Clerk (referred to' as the “Sales Audit Report"). This report was compared with the Daily Cashier’s Summary as above indicated.
d) Using the Sales Audit Report, a clerk in the Sales Audit Department would then prepare Cash Commission Tickets which were simply small slips of paper on which the clerk wrote the sales clerk’s number, the total amount of sales by that clerk for the day as shown by the Sales Audit Report, and the date. After preparing these slips the clerk totalled the amount of sales she had written.on all the .slips and compared the total with the Sales Audit Report from which they had been prepared. The clerk then placed the slips in a drawer in the Sales Audit Department. At the end of, each month the Sales Audit Department rearranged the slips by clerk instead of by day and entered each clerk’s sales in a Monthly Commission Summary form which was used by the pay roll clerk in preparing the payroll for the sales clerks.
e) After the foregoing records were prepared, the cashier would turn over to the defendant the Daily Cashier’s Summary prepared by her and would place the cash receipts on a desk in the cashier’s cage. During the day the defendant would enter the cage and place the cash in a strong box to which he had the only key and place the box in the safe located inside the cashier’s cage. The Daily Cashier’s Summary was retained by defendant and was never returned to the cashier.
f) The Sales Audit Department would daily turn over to defendant the cash register tapes and the Sales Audit Report. These records were retained by defendant and never returned to the Sales Audit Department. After the Monthly Commission Summary was prepared it was shown to defendant and then filed in the Sales Audit Department
g) After receipt of the Daily Cashier’s Summary, the cash register tapes and the Sales Audit Report the defendant regularly prepared two reports viz.: the Daily Cash Receipts Summary and the Daily Summary of Cash Sales by Department. After prepartion of these two records he then gave to the cashier a memorandum of the amount to be deposited in bank together with sufficient funds from the locked box to cover it.
After -determining from plaintiff’s employees the cash accounting procedure as above outlined, Mr. Thokey proceeded with an examination of such records as could be found covering the period June 1, 1959 through January 17, 1961. The records which were found included the Daily Cash Receipts Summaries and the Daily Summaries of Cash Sales by Department (prepared by the defendant), the Cash Commission Slips for the period June 1, I960 *303 through January 17, 1961 (prepared by the Sales Audit Department) and the Monthly Commission Summaries for June 1959 through January 17, 1961 (prepared by the Sales Audit Department). Except for twelve scattered days during the year and a half period, none of the cash register tapes, cash sales slips prepared by the selling clerks, Sales Audit Reports, Daily Cashier’s Summaries or deposit memorandums could he found. In short none of the basic cash media was available to Mr. Thokey.
Mr. Thokey rendered a written report on May 3, 1961 in which he concluded that during the period June 1, 1959 through January 17, 1961 plaintiff’s Dryades Street store had sustained a shortage in its cash receipts in a minumum amount of $67,-649.64.
Plaintiff’s contention that a cash shortage existed is premised upon the difference between two sets of figures i. e. the difference found by Mr. Thokey to exist between the total amount of sales as shown by the Monthly Commission Summaries and Commission Sales Slips prepared by the Sales Audit Department and the total amount of ■cash sales reported by defendant on the Daily Cash Receipt Summaries and Daily Summaries of Cash Sales by Departments prepared by him. Mr. Thokey’s -opinion was that this difference represented a cash shortage. His opinion that the difference represents a cash shortage is based upon a list of ten assumptions, the first nine of which covered the method of handling and reporting the cash receipts as described to him by plaintiff’s office personnel. Defendant does not dispute the correctness of these nine assumptions. The tenth assumption that “no commissions were paid on mail ■order sales” is contended by defendant to be incorrect.
After testifying on the basis of the ten .assumptions that a cash shortage existed, Mr. Thokey was then requested to make five additional assumptions, and on the basis of ¡the five additional assumptions to give his opinion as to who might be responsible for the shortage.
The additional assumptions are as follows :
1. That the comptroller (defendant) regularly took possession of all cash received in the ordinary course of business.
2. That the comptroller regularly received all daily cash media prepared by the cashier and the Sales Audit Department, except the daily commission slips.
3. That the comptroller regularly prepared two summary, reports i. e. the Daily Cash Receipts Summary and the Daily Summary of Cash Sales by Department.
4. That the .comptroller periodically gave to the cashier funds to be deposited in the bank and a memorandum thereof.
5. That it was the comptroller’s policy not to retain the daily cash register tapes 'or the Sales Audit Department Summaries .of Cash Sales by Clerk and Department or the Daily Cashier’s Summary of cash sales or the money tallies by the individual sales people.
On the basis of these additional assumptions Mr. Thokey testified that of the three persons (the sales clerk, the cashier and the comptroller) who handled cash, the comptroller (defendant) was the person in the best position to take the money if he were of a mind to do so. His reasons were that the comptroller was the only person who had possession of the cash alnd alb of the basic- records at the same time and was therefore in a position to steal cash and to edver up the shortage by falsifying the cash summaries prepared by him and by 'thereafter destroying the-cash register tapes and other basic cash media.
Defendant denies that he regularly took possession- of all cash- receipts, denies that he gave the cashier funds to be deposited in the bank, denies that it was his policy not to • retain the basic cash media and further denies that he destroyed any records on Gauscd any to be destroyed.
*304 •. Defendant 'admits there is a difference between the total amount of sales shown by the Daily Commission Slips and the total amount of sales reported by defendant in his Summaries of Cash Sales but contends that this is merely a difference between two sets of figures and does not reflect a cash shortage. He contends that the Commission Sales Slip figures are themselves unreliable, that they moreover contain many items besides the price of the merchandise and contends that the mere fact that there is a difference between the two sets of figures only indicates that there are some things included in one set of figures which are not necessarily included in • the other set. Defendant moreover contends that if there is a cash shortage (which he denies), plaintiff has failed, to prove that defendant was guilty of taking anything from plaintiff.
After painstakingly reviewing the voluminous-record in this case we find ourselves -in 'agreement with the. “Reasons for •Judgment” prepared', by the- Trial Judge, .which we quote in full' as follows:
“REASONS FOR JUDGMENT”
“This is an action to recover for funds allegedly embezzled from a department'store by its controller. Plaintiff has undertaken to prove its alleged loss or shortage by circumstantial evidence only.
“This Court has considerable doubt as to whether the plaintiff has in fact suffered any loss or shortage as a result of an embezzlement. However, whether the plaintiff did or did not suffer any loss or shortage as a result of an embezzlement, theft, or misappropriation becomes immaterial, for the reasons more fully set forth hereinafter.
“Plaintiff has premised its case primarily upon; a difference between two sets of figures i. e., 'the commission sales summary and the so-called actuad or recorded sales. However, all of plaintiff’s witnesses admit that the total of-the commission sales figures includes items other than the sales price of the merchandise. There is no dispute about sales taxes and federal excise taxes being included in the commission sales; however, defendant contends that mail order sales and executive sales were included in commission-sales, and plaintiff contends that mail orders and executive sales were not or should not have been included therein.
“Plaintiff also contends that the defendant systematically destroyed the primary records; however, defendant has produced at least two witnesses who were employed by the plaintiff at the time of the trial and who testified as to what appeared to be a wholesale destruction of company records by the plaintiff during the summer of 1960. This Court cannot, therefore, concluded that the defendant has been the sole cause of a systematic destruction of plaintiff’s primary records.
“Plaintiff hired an accountant and started him to work after defendant left its employ, directing the accountant to make two sets of assumptions. In the first set of ten assumptions, nine are admitted by defendant to be correct. The tenth assumption, and the one which defendant contends is incorrect, is that no commissions were paid on-mail order sales.
“The second set of five assumptions generally related to possession of cash, cash records and reports, and sales records and reports. In this second set of assumptions, defendant denies that he regularly took possession of all cash received in the ordinary course of business, further denies that he gave-the cashier funds to be deposited in the bank, and further denies that he destroyed records of the plaintiff.
“Thus, defendant has denied the validity of at least four of the'assumptions upon which plaintiff’s accountant has *305 based his report. If any of these assumptions are unwarranted, it would, therefore, appear that the conclusion reached by plaintiff’s accountant, relative to the existence of the alleged loss or shortage, would.also be unwarranted.
“Although the testimony is conflicting in some respects, several things are readily apparent with regard to both mail order sales and the records. If the original cash register records were available, they could vindicate the defendant of these charges by showing that there was no loss or shortage, or they might prove that the plaintiff did suffer a cash loss or shortage, as it claims. However, even if the original cash register records were available, and even if the plaintiff proved that it did suffer a cash loss or shortage as it claims, there is no evidence before this Court to warrant a finding that the defendant caused the loss or stole or embezzled the missing funds.
“Plaintiff’s accountant testified that the defendant was in the best position to take the money, provided that all of the assumptions which he used relative to the operation of the system were correct. However, this latter proviso, which the accountant uses, clearly shows how conjectural plaintiff’s case is, as to this defendant. In other words, plaintiff points the accusing finger at defendant; but all that the witnesses can say is that defendant was in the best position to take this money. Such testimony is clearly insufficient to justify a finding that this defendant is guilty of misappropriating, stealing, or embezzling any of plaintiff’s monies.
“If this were a criminal case, the state’s evidence in a circumstantial case such as this would have to exclude every reasonable hypothesis of innocence. LSA-R.S. IS :438. However, this is a civil case, and plaintiff must here prove its case by a preponderance of the evidence. Plaintiff still has the burden of proving the alleged theft or embezzlement by the defendant by clear and convincing evidence, and this the plaintiff has not done.
“If this Court felt that the plaintiff did suffer some loss as a result of the alleged embezzlement having occurred as plaintiff contends this Court could not award the plaintiff a judgment against this defendant. This Court cannot indulge in the presumption that this defendant was dishonest, nor can this Court speculate as to who was responsible for the alleged loss or alleged shortage, even if this Court assumes that the alleged loss or alleged shortage has been proven by a preponderance of the evidence. See J. H. Rutter-Rex Mfg. Co. v. Liberty Mutual Ins. Co., [La.App.], 160 So.2d 306, and authorities cited therein.
“Therefore, plaintiff’s suit shall be dismissed.”
We have been unable to locate defendant’s original reconventional demand in the record but the record does contain an amendment thereto wherein defendant prayed for judgment against plaintiff in the sum of $248,500.00 for damages based on alleged libellous statements contained in plaintiff’s petition and in an additional sum of $7,500.00 for wrongful issuance of the writ of attachment. Plaintiff filed an exception of no cause of action to the reconven-tional demand and the record indicates that the Trial Judge (see Tr. page 1220) maintained the exception insofar as damages for libel are concerned because such a cause of action would not come into existence until after the termination of the suit. However the Trial Judge announced that he would hear evidence “insofar as damages are concerned with the issuance of the conservatory writ,” and defendant in fact adduced some testimony in this regard before closing his case and there is no indication in the record that he was prevented from putting in all of his evidence on this score.
*306 We are of the opinion that the ruling of the Trial Judge was correct as to the damages based on libel (see Thomas v. Mobley, La.App., 118 So.2d 476 and cases there cited; Robinson Mercantile Co. v. Freeman, La.App., 172 So. 797) and defendant has apparently acquiesced in such ruling. However in his answer to the appeal defendant prays that the case be remanded in order to permit him to proceed with proof on that part of his reconventional demand for damages growing out of the issuance of' the writ of attachment. He makes no mention of this in his brief and prays merely that the judgment appealed from be affirmed. We conclude that defendant has abandoned 'the point.
For the foregoing reasons the judgment appealed from is affirmed, costs of this appeal to be borne by plaintiff.
Affirmed.